June 20, 2023

**Supreme Court**

No. 2019-388-C.A.
(P1/15-2223A)
No. 2019-415-C.A.
(P1/07-2888A)

(Concurrence and Dissent
begins on page 62)

State                :

v.                :

Louis Sinapi.            :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email:    opinionanalyst@courts.ri.gov,    of    any typographical  or  other  formal  errors  in  order  that corrections may be made before the opinion is published.

**Supreme Court**

No. 2019-388-C.A.
(P1/15-2223A)
No. 2019-415-C.A.
(P1/07-2888A)

(Concurrence and Dissent
begins on page 62)

|  |  |
|---|---|
| State | : |
| v. | : |
| Louis Sinapi. | : |

Present:  Suttell, C.J., Goldberg, Robinson, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  These consolidated cases came before the Supreme Court on October 26, 2022.  The defendant, Louis Sinapi, appeals from two judgments—first, a judgment of conviction following a jury trial for larceny of an automobile and second, a judgment adjudicating him a probation violator.  On appeal, the defendant assigns error to the denial of his motion to suppress certain evidence collected as a result of a warrantless search of his real-time cell-site

- 1 -

location information (CSLI), certain evidentiary rulings made by the trial justice, and the trial justice's determination that he was a probation violator. For the reasons set forth in this opinion, we affirm the judgments of the Superior Court.

**Facts and Travel**

On the morning of December 30, 2014, around noontime, John Fiore was found dead in his apartment in Cranston, Rhode Island, by his sister, Jill Cataldi. Ms. Cataldi last saw Fiore on Thursday, December 25, 2014, during a family Christmas celebration. Mr. Fiore was expected to attend a wake on Sunday, December 28, 2014, but, inexplicably, was absent. The following day, Monday, December 29, 2014, Fiore failed to report to work. When he again failed to report to work on Tuesday, December 30, 2014, Fiore's supervisor became concerned about him and called Cataldi, informing her of Fiore's unexplained absences. Ms. Cataldi went to Fiore's apartment to check on him, but noticed that his car, a silver 2009 Chevy Impala, was missing from the parking lot of his apartment complex. As a result, Cataldi assumed Fiore was not home, and searched for him in numerous places he was known to frequent. Unable to locate her brother, Cataldi contacted the property manager of Fiore's apartment complex to gain access to his apartment. Upon entering the apartment, Cataldi found her brother's body; he died from apparent stab wounds. The medical examiner subsequently determined that the manner of death was homicide and that Fiore had been dead for one or two days.

Members of the Cranston Police Department responded to the scene and began an investigation. Because Fiore's car was not in the parking lot, the police reported it as stolen. Ms. Cataldi also informed the police that in addition to Fiore's car, two of his guns were missing as well as a gold bracelet and a ring. Furthermore, the line to Fiore's landline phone and answering machine had been cut and the answering machine was missing.

That same day, the police identified three suspects; one of whom was defendant.[1] The defendant was considered a suspect based upon previous interactions between defendant and Fiore. Specifically, in January of 2014, Fiore filed a complaint with the Cranston police regarding a gun that he believed defendant had stolen. Then, in March 2014, Fiore informed a police officer that defendant had threatened to kill him.

Detective Michael Gates and Detective Michael Pezzullo were assigned to investigate whether defendant was a suspect. That afternoon the detectives received information that defendant was at the Rhode Island Department of Corrections Dorothea Dix Building in Cranston, meeting with a probation officer. The defendant had been released from jail a mere five days before, on December 25, 2014. The detectives went to the probation office at about 2:00 p.m. and drove through the parking lot in search of Fiore's missing car. Not finding the vehicle, the detectives

---

[1] Two other men were also identified as suspects but were later ruled out by police.

headed toward the building. On their way, the detectives encountered a man walking away from the probation office. They identified themselves as Cranston police officers and asked him if he was defendant; it did not go well. The man denied he was Sinapi and stated that his name was Tom Manfredi.[2] He could not produce identification. The man continued on his way and soon thereafter the detectives were informed by the probation officer that defendant had just left her office. The description they were provided matched that of the man they had just encountered. He was wearing black gloves and a distinctive black hat with dice on it. Detective Pezzullo testified that the fact that defendant lied about his identity in order to elude the officers heightened his suspicion that he was involved in the murder and gave rise to a real concern that defendant would destroy relevant evidence. After the detectives checked the local area in hopes of locating Sinapi, they returned to the probation office and obtained defendant's cell phone number and address.

The detectives then contacted Cranston Detective Lee Sohn and provided him with defendant's cell phone number. In order to obtain defendant's location, without first obtaining a warrant, Det. Sohn contacted defendant's cell phone carrier—

---

[2] Detective Gates testified that the man said his name was either "John or Tom" Manfredi. Detective Pezzullo testified that the man said his name was "Tom Manfredi."

Sprint—and requested access to defendant's real-time CSLI.[3] Sprint began sending Det. Sohn defendant's real-time CSLI in the form of GPS coordinates and Det. Sohn relayed this information to Det. Pezzullo. The real-time CSLI indicated that defendant was first in the area of the Warwick Mall. The detectives traveled to the Warwick Mall and searched for defendant, but were unable to find him. The defendant's real-time CSLI next indicated that he was traveling north on Route 2, towards Cranston and in the vicinity of Reservoir Avenue in Cranston. The detectives again responded to the area but could not locate defendant. The next ping indicated that defendant was traveling west from the Olneyville neighborhood in Providence, then through the Hartford Public Housing neighborhood and into the town of Johnston. The police were aware that defendant's former girlfriend, Josephine Rossi, resided at 15 South Fairview Street in Johnston and that defendant had been staying at that address for an unknown period of time.[4] As a result, Det. Pezzullo and Det. Gates drove to 15 South Fairview Street at about 5:40 p.m., and parked near Josephine's house in order to monitor the location.

---

[3] "Cell-site location information is the record created every time a cell phone transmits or receives data through a cell tower." *United States v. Trader*, 981 F.3d 961, 967 (11th Cir. 2020), *cert. denied*, 142 S. Ct. 296 (2021). There are two types of CSLI—historical and real-time—although these terms are somewhat self-explanatory, the difference will be discussed in detail *infra*.

[4] Christina Rossi, Josephine Rossi's daughter, also resided at 15 South Fairview Street at the time. We refer to Christina Rossi and Josephine Rossi by their first names for ease of reference and to avoid confusion. No disrespect is intended.

According to the testimony, Josephine came out of her house and approached the detectives, who identified themselves as police officers and informed her that they were looking for defendant. Josephine consented to a search of her residence. Inside, the officers observed that the back door was open, and saw a cell phone and black gloves on the kitchen table, similar to the ones defendant had been wearing. Detective Pezullo asked Det. Sohn to call the phone number associated with the cell phone they had been tracking, and the phone on the table rang. Detective Pezzullo also observed a black trash bag and what appeared to be clothes inside. In the backyard, a hat identical to the one defendant was wearing earlier in the day lay on the ground. Based on their observations, the police concluded that Sinapi had been at the residence but fled upon their arrival. The police secured the residence and applied for and obtained a search warrant for the premises. Pursuant to the warrant, the police seized a plastic bag containing prescription pills, an envelope, the black trash bag and its contents, the hat with the dice on it, the black gloves, and the cell phone.

Around 6:00 p.m., the Johnston and Providence police were notified that the Cranston police were looking for defendant. Shortly thereafter, Officer Allen Spiver of the Providence Police Department noticed an individual hiding behind a bush in front of a Citizens Bank in Providence. When Officer Spiver exited his car to investigate, the individual fled, but was quickly apprehended and placed under

arrest. He was identified as defendant. At the time of his arrest, defendant had cuts on his head and hands and an abrasion on his knee, all of which were photographed. DNA from the murder scene subsequently was identified as that of Sinapi.

The decedent's vehicle was located on January 1, 2015, at 17 Hillside Avenue in Johnston. The car was towed to the Cranston police station; a green jacket and a red sweatshirt were on the rear seat. Ms. Cataldi identified the red sweatshirt as belonging to her brother. Christina informed police that she had observed defendant wearing the red sweatshirt that was found in Fiore's car;[5] defendant's DNA was found on the sweatshirt. Furthermore, surveillance footage showed defendant entering a convenience store on Manton Avenue just down the street from 17 Hillside Avenue where Fiore's car was found. Historic CSLI also placed defendant's phone in the vicinity of Hillside Avenue on December 30, 2014.[6] Additionally, evidence was presented at trial that DNA found within Fiore's vehicle was consistent with defendant's DNA profile. Evidence also was introduced at trial that on December 26, 2014, defendant proposed a trade of the Chevy Impala to two drug dealers in exchange for narcotics. The offer was declined.

---

[5] Christina also informed police that she saw defendant wearing a ring and a bracelet on December 30, 2014. She told police that she had never seen defendant wear those items before that date.

[6] Although the detectives in this case did not obtain a warrant prior to accessing defendant's real-time CSLI, they did so before seeking defendant's historic CSLI.

On January 2, 2015, the state filed a violation of probation notice pursuant to Rule 32(f) of the Superior Court Rules of Criminal Procedure in the Superior Court, alleging that defendant had violated his probation (the first violation notice). The defendant had previously been convicted of one count of robbery in the first degree in violation of G.L. 1956 § 11-39-1(a) and was sentenced to a term of fifteen years, three years to serve, the balance suspended, with probation. On March 23, 2015, defendant admitted to the violation and the Superior Court executed three years of his suspended sentence. Subsequently, defendant was indicted, in this case, for murder in violation of G.L. 1956 § 11-23-1, felony larceny in violation of G.L. 1956 § 11-41-1, and two counts of possession of a controlled substance in violation of G.L. 1956 § 21-28-4.01(c)(2)(i). On July 8, 2015, the state filed a second violation of probation notice (the second violation notice), alleging that defendant failed to comply with a condition of his probation by failing to "keep the peace and be of good behavior" based upon conduct set forth in the indictment in P1/15-2223A, which was attached to the notice.

By agreement of the parties, a combined jury trial on the indictment and a second violation hearing commenced on October 18, 2018. The jury found defendant guilty of larceny but not guilty of murder or possession of controlled substances. The defendant's motion for a new trial was denied. The trial justice thereafter determined that defendant had violated the terms and conditions of his

probation. The trial justice imposed a six-year sentence on the larceny count and a nine-year sentence on the probation violation, to be served consecutively. The trial justice also adjudged defendant to be a habitual offender and imposed an additional twenty years, three years to serve and the remainder suspended, with probation, to be served consecutively, pursuant to the habitual offender statute, G.L. 1956 § 12-19-21. This appeal followed.

## Issues on Appeal

Before this Court, defendant claims that the trial justice erred by (1) denying his motion to suppress certain evidence collected as a result of a warrantless search of his real-time CSLI; (2) denying his motion to suppress David DiSano's identification of him pursuant to Rule 403 of the Rhode Island Rules of Evidence; (3) denying his motion to exclude Cataldi's testimony regarding her brother's refusal to loan his car to others pursuant to Rule 406 of the Rhode Island Rules of Evidence; and (4) determining that he had violated the terms and conditions of his probation based upon the second violation notice. We address each claim of error in turn.

## I

### Motion to Suppress Real-Time CSLI

We begin by addressing defendant's claim that the trial justice erred in denying his motion to suppress evidence collected as a result of the warrantless search of his real-time CSLI that resulted in his apprehension. The defendant's

- 9 -

argument is twofold. First, he contends that accessing real-time CSLI data constituted a search under the Fourth Amendment of the United States Constitution for which the police were required to obtain a warrant. Second, defendant argues that the exigency exception to the warrant requirement was not applicable under the facts of this case.

The defendant filed a pretrial motion to suppress the fruits of the warrantless acquisition of his whereabouts via real-time CSLI. He argued that when the officers obtained his real-time CSLI without a warrant, his rights under the Fourth Amendment of the United States Constitution and his rights under article 1, section 6 of the Rhode Island Constitution, and G.L. 1956 § 12-32-2 were violated.[7] The defendant sought suppression of the following evidence as fruits of the poisonous tree: (1) defendant's cell phone, (2) the envelope and its contents, (3) the black dice hat, (4) the black gloves, (5) the black trash bag and its contents, (6) the white powdery substance, (7) two sets of pills, (8) conversations with the occupants of Josephine's home, (9) evidence of defendant's flight from Joesphine's home, (10) evidence that defendant hid in the bushes in front of the Citizens Bank, (11) defendant's statements to the police after his arrest, and (12) evidence of defendant's bodily injuries when arrested.

---

[7] General Laws 1956 § 12-32-2 provides: "No agent of the state, or any political subdivision of the state, shall obtain location information without a warrant unless a warrant requirement exception applies."

Hearings on the motion spanned several days and included the testimony of various detectives. At the conclusion, the trial justice assumed, without deciding, that obtaining defendant's real-time CSLI constituted a search under the Fourth Amendment, but that the exigent circumstances to the warrant requirement applied in this case. The trial justice explained that the police were actively investigating a recent homicide in which the victim's automobile, answering machine, and two guns were missing. Evidence relating to the murder could have been within the missing vehicle. The trial justice reasoned that defendant was a suspect in the homicide based upon credible information that he was alleged to have stolen a gun on a prior occasion and had threatened to kill the victim, coupled with the fact that defendant lied about his identity and evaded the police at the probation office. At trial, most of the evidence defendant had sought to suppress was admitted into evidence.[8]

**Standard of Review**

"When called upon to review a trial justice's denial of a motion to suppress on Fourth Amendment grounds, our task is to review the record to determine, based on the totality of the circumstances, whether the evidence sought to be suppressed was obtained in violation of the constitutional prohibition against warrantless

---

[8] Nowhere in the record, however, does it reveal that any "white powdery substance" or testimony related thereto was admitted as evidence at trial. The defendant also acknowledges in his brief that his statements made to the police at the police station were suppressed under a separate motion. Because this evidence was not admitted at trial, we do not address whether it should have been suppressed.

searches and seizures." *State v. Terzian*, 162 A.3d 1230, 1238 (R.I. 2017) (quoting *State v. Barkmeyer*, 949 A.2d 984, 995 (R.I. 2008)). "In reviewing a ruling on a motion to suppress, this Court gives deference to a trial justice's factual findings, and those historical 'findings shall not be disturbed unless they are clearly erroneous.'" *State v. Quinlan*, 921 A.2d 96, 105 (R.I. 2007) (quoting *State v. Verrecchia*, 766 A.2d 377, 382 (R.I. 2001)). "We will, however, conduct a *de novo* review of the record and independently consider whether a defendant's rights have been violated." *State v. Taveras*, 39 A.3d 638, 646 (R.I. 2012) (quoting *State v. Parra*, 941 A.2d 799, 803 (R.I. 2007)).

## Analysis

### A

### Real-Time CSLI Under the Fourth Amendment

The defendant first argues that the warrantless acquisition of his real-time CSLI to learn his location violated the Fourth Amendment. The defendant suggests that although the United States Supreme Court's seminal holding in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), concerned historical CSLI, its rationale is equally applicable to real-time CSLI. This Court has not had occasion to address whether the state conducts a search when it accesses real-time CSLI to obtain access to the cell phone user's movements. In the case at hand, the trial justice assumed without deciding that obtaining defendant's real-time CSLI constituted a search

- 12 -

under the Fourth Amendment and proceeded to deny the motion to suppress based on the exigent-circumstances exception to the warrant requirement. We nonetheless reach this issue because we deem it critical for law enforcement, the bar, and the bench to know that the acquisition of an individual's real-time CSLI is a search that requires a warrant. After all, all warrantless searches are *per se* unreasonable. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This amendment is meant "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of these exceptions has come to be identified as exigent circumstances. *See Missouri v. McNeely*, 569 U.S. 141, 148-49 (2013). In *Katz*, the United States Supreme Court

- 13 -

recognized that "the Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351. This Court has held that "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *State v. Patino*, 93 A.3d 40, 51 (R.I. 2014) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)). The touchstone in a constitutional analysis is reasonableness.

In determining whether an individual has a reasonable expectation of privacy, "no single factor invariably will be determinative." *State v. Casas*, 900 A.2d 1120, 1129-30 (R.I. 2006) (quoting *Rakas v. Illinois*, 439 U.S. 128, 152 (1978)). "Thus, we consider a number of factors, including 'whether the suspect possessed or owned the area searched or the property seized; his or her prior use of the area searched or the property seized; the person's ability to control or exclude others' use of the property; and the person's legitimate presence in the area searched.'" *Id.* at 1130 (quoting *State v. Linde*, 876 A.2d 1115, 1127 (R.I. 2005)). "The determination of whether there is a reasonable expectation of privacy * * * is a two-tiered analysis: (1) the defendant must have a 'subjective expectation of privacy,' *and* (2) the expectation must also be 'one that society accepts as objectively reasonable.'" *Quinlan*, 921 A.2d at 109 (quoting *State v. Bertram*, 591 A.2d 14, 19 (R.I. 1991)).

Unquestionably, the proliferation of cell phones throughout modern society presents unique Fourth Amendment issues that courts continue to confront. "As

- 14 -

technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes, [the United States Supreme] Court has sought to 'assure[ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Carpenter*, 138 S. Ct. at 2214 (quoting *Kyllo*, 533 U.S. at 34). The United States Supreme Court has touched upon some of the issues the prevalence of modern technology, such as GPS trackers—including those in cell phones—has spawned in the context of the Fourth Amendment.

For example, in *United States v. Knotts*, 460 U.S. 276 (1983), the Court determined that monitoring the signal of a beeper placed in a five-gallon drum containing chloroform that was being transported to a cabin did not constitute a search. *See Knotts*, 460 U.S. at 277, 285. The Court reasoned that the government did not invade any legitimate expectation of privacy of the cabin owner because the vehicle carrying the container traveled on public roads and the container ended up in an open field near the cabin. *Id.* at 281-82. Similarly, in *United States v. Karo*, 468 U.S. 705 (1984), the Court again addressed whether the installation of a beeper device in a container amounted to a search. *Karo*, 468 U.S. at 707. The Court concluded that the installation of the beeper was not a search because the device was installed with the consent of the original owner of the container, and only thereafter was the container delivered to a buyer who had no knowledge of its presence. *Id.* at

- 15 -

711-13. The Court concluded, however, that the government's act of monitoring the beeper while it was within a private residence "violate[d] the Fourth Amendment rights of those who have a justifiable interest in the privacy of the residence." *Id.* at 714.

More recently, in *United States v. Jones*, 565 U.S. 400 (2012), the United States Supreme Court distinguished both *Knotts* and *Karo*. *See Jones*, 565 U.S. at 408-10. In *Jones*, the Court held that attaching a GPS tracking device to a suspect's vehicle in order to monitor the vehicle's movements on public streets constituted a search within the meaning of the Fourth Amendment. *Id.* at 404. The government tracked the vehicle's movements via the GPS device for twenty-eight days. *Id.* at 403. Utilizing the device, the government was able to establish the vehicle's location within fifty to one hundred feet and relayed more than 2,000 pages of data over a four-week period. *Id.* The Court explained that the defendant in *Jones*, "who possessed the Jeep at the time the Government trespassorily inserted the information-gathering device, [was] on much different footing" from both *Knotts* and *Karo*. *Id.* at 408-10.

Two years later, in *Riley v. California*, 573 U.S. 373 (2014), the Court recognized that "[o]ne of the most notable distinguishing features of modern cell phones is their immense storage capacity," *Riley*, 573 U.S. at 393, which can reveal "the privacies of life," *id.* at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 630

(1886)), and opined that "[t]he fact that technology now allows an individual to carry such information in his hand does not make [it] any less worthy of the protection for which the Founders fought," *id.* The Court held that a search of the contents of a cell phone constitutes a search under the Fourth Amendment, requiring a warrant. *Id.*

In *Carpenter*, the Court explicitly recognized that the omnipresence of cell phones in today's daily life gives rise to important privacy concerns: "Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called 'cell sites.'" *Carpenter*, 138 S. Ct. at 2211. These "cell sites" are oftentimes found on a cell tower, but "they can also be found on light posts, flagpoles, church steeples, or the sides of buildings." *Id.* A cell site "typically [has] several directional antennas that divide the covered area into sectors." *Id.*

An individual's cell phone can "tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features." *Carpenter*, 138 S. Ct. at 2211. The cell phone "continuously scan[s] [its] environment looking for the best signal, which generally comes from the closest cell site." *Id.* When the cell phone "taps" into the wireless network by connecting to a cell site, "it generates a time-stamped record known as cell-site location information (CSLI)." *Id.* The accuracy of CSLI "depends on the size of the geographic area covered by the cell site"; "[t]he greater the concentration of cell sites, the smaller the

coverage area" and the more accurate the information becomes. *Id.* Over time, "wireless carriers have installed more cell sites" which "has led to increasingly compact coverage areas, especially in urban areas." *Id.* at 2212. Furthermore, "[w]hile carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI." *Id.*

There are two types of CSLI—historical and real-time. *See* Jonathan Bard, *Unpacking the Dirtbox: Confronting Cell Phone Location Tracking with the Fourth Amendment*, 57 B.C. L. Rev. 731, 746 (2016). Historical CSLI details a cell phone user's past movements, often used to link a suspect to a crime that has already occurred. *See Carpenter*, 138 S. Ct. at 2218. Real-time CSLI, on the other hand, enables law enforcement to track and pinpoint the current location of an individual via their cell phone. *See* Matthew DeVoy Jones, *Cell Phones Are Orwell's Telescreen: The Need for Fourth Amendment Protection in Real-Time Cell Phone Location Information*, 67 Clev. St. L. Rev. 523, 529 (2019). To obtain an individual's real-time CSLI, police can request the individual's cellular service provider to "ping" a cell phone, causing the cell phone to transmit its GPS coordinates to the provider, who in turn can relay this information to the police,

oftentimes leading to the apprehension of a suspect to a crime. *See Commonwealth v. Almonor*, 120 N.E.3d 1183, 1187 n.1 (Mass. 2019).

In *Carpenter*, the Supreme Court was faced with determining whether the government conducts a search under the Fourth Amendment when it seeks to acquire after-the-fact historical CSLI that provides a comprehensive account of the user's past movements. *Carpenter*, 138 S. Ct. at 2211. The Court declared that "an individual maintains a legitimate expectation of privacy in the record of his [or her] physical movements as captured through CSLI." *Id.* at 2217. Thus, the Court held that "[t]he location information obtained from [the defendant's] wireless carriers was the product of a search." *Id.*

Notably, however, the holding in *Carpenter* was limited to historical CSLI and not real-time CSLI. *Carpenter*, 138 S. Ct. at 2220 ("Our decision today is a narrow one. We do not express a view on matters not before us: real-time CSLI or 'tower dumps' * * *."). The Supreme Court has yet to address whether the acquisition of an individual's real-time CSLI constitutes a search under the Fourth Amendment; and there exists a split of authority among jurisdictions that have addressed this issue.[9] We are thus confronted with the task of reconciling the Fourth

---

[9] *Compare United States v. Hammond*, 996 F.3d 374, 387 (7th Cir. 2021) (concluding that the collection of the defendant's real-time CSLI did not constitute a search under the Fourth Amendment), *and Sims v. State*, 569 S.W.3d 634, 646 (Tex. Crim. App.), *cert. denied*, 139 S. Ct. 2749 (2019), *with Commonwealth v. Reed*, 647 S.W.3d 237, 250 (Ky. 2022), *United States v. Baker*, 563 F. Supp. 3d 361,

Amendment's warrant requirement to the state's legitimate need to chronicle an individual's real-time movements through his or her cell phone signals.

Although *Carpenter* was limited to historical CSLI, we are of the opinion that its reasoning is equally applicable to real-time CSLI. In *Carpenter*, the Court opined that "[a]s with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his [or her] particular movements, but through them his [or her] 'familial, political, professional, religious, and sexual associations.'" *Carpenter*, 138 S. Ct. at 2217 (quoting *Jones*, 565 U.S. at 415). This is true whether the data reveals where a suspect has been, where he or she is, or where he or she is heading.

Furthermore, "like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools." *Carpenter*, 138 S. Ct. at 2217-18. It is an efficient use of resources and scientifically reliable. But real-time CSLI can present even greater privacy concerns than GPS monitoring. *See id.* at 2218. As explained in *Carpenter*, "[u]nlike the bugged container in *Knotts* or the car in *Jones*, a cell phone—almost a 'feature of human anatomy,' * * *—tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time." *Id.* (quoting

---

382 (M.D. Pa. 2021), *Commonwealth v. Pacheco*, 263 A.3d 626, 640 (Pa. 2021), *State v. Muhammad*, 451 P.3d 1060, 1072 (Wash. 2019), *and State v. Snowden*, 140 N.E.3d 1112, 1126 (Ohio Ct. App. 2019).

*Riley*, 573 U.S. at 385). As a result, "[a] cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* For these reasons, we conclude that although similar in some respects, there is an even greater expectation of privacy in one's real-time CSLI than simply one's location or movement, tracked via the GPS monitoring of a vehicle traveling on public streets. *See Jones*, 565 U.S. at 408-09. If police were permitted to obtain real-time CSLI without a warrant supported by probable cause, "[o]nly the few without cell phones could escape" what could amount to "tireless and absolute surveillance" by the government. *Carpenter*, 138 S. Ct. at 2218. Blanket access to real-time CSLI could permit the government to "achieve[] near perfect surveillance, as if it had attached an ankle monitor to the phone's user." *Id.*

In the case at bar, we are mindful that at least two of the "pings" of defendant's cell phone occurred while he was in public areas—the Warwick Mall and on a public road en route to the town of Johnston—and therefore he could have been observed by the detectives during a traditional surveillance. *See Jones*, 565 U.S. at 408-09 (explaining that visual observation of an individual on public roads is not a search); *see also Swerdlick v. Koch*, 721 A.2d 849, 857 (R.I. 1998) (holding that individuals "were not entitled, nor could they reasonably have expected, to maintain privacy with respect to those activities taking place outside of their residence in a location

- 21 -

visible to any passersby"). However, the detectives in this case were confronted with a fleeing suspect, did not know his whereabouts, and could not track him by visual observation. They learned of his movements solely through real-time CSLI. If the state could utilize a cell phone's substantial monitoring and tracking features without a warrant supported by probable cause, it may very well "alter the relationship between citizen and government in a way that is inimical to democratic society," *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring), as there are more than 300 million cell phone users in this country, *see id.* at 428 (Alito, J., concurring).

Arguments against finding that the acquisition of real-time CSLI is a search under the purview of the Fourth Amendment focus on either (1) the limited nature of the information obtained via real-time CSLI or (2) the third-party doctrine. *See State v. Muhammad*, 451 P.3d 1060, 1072 (Wash. 2019). We reject both of these arguments and address each in turn.

We note that in the case before us, detectives pinged defendant's phone over the course of a single day, December 30, 2014.[10] Although the state's request for CSLI was limited, we are of the opinion that it constituted a search. We decline to split hairs or count pings. *See Muhammad*, 451 P.3d at 1073 ("[T]o conclude that one cell phone ping is not a search, provided it lasts less than six hours, yet hold

---

[10] Detective Sohn testified that defendant's phone was "pinged" four times.

multiple or longer pings *do* qualify as search is not a workable analysis.").[11] To do so would be to draw an arbitrary line, unrelated to an individual's reasonable expectation of privacy.

We also decline to apply the third-party doctrine to real-time CSLI. In *Carpenter*, the Court rejected the application of the doctrine to historical CSLI "[g]iven the unique nature of cell phone location records * * *." *Carpenter*, 138 S. Ct. at 2217. We do the same and conclude that "the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection." *Id.* The third-party doctrine has "fail[ed] to contend with the seismic shifts in digital technology" that make possible tracking a person's location. *Id.* at 2219. Real-time CSLI "is not truly 'shared' as one normally understands the term." *Id.* at 2220. Cell phones are "'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Id.* (quoting *Riley*,

---

[11] "The theory that discrete acts of surveillance by law enforcement may be lawful in isolation, but may otherwise infringe on reasonable expectations of privacy in the aggregate because they 'paint an intimate picture of a defendant's life,' has been referred to as the mosaic theory." *Tracey v. State*, 152 So. 3d 504, 520 (Fla. 2014) (quoting *United States v. Wilford*, 961 F. Supp. 2d 740, 771 (D. Md. 2013)). As in *Tracey*, we reject this theory because "[i]t requires case-by-case, after-the-fact, ad hoc determinations whether the length of the monitoring crossed the threshold of the Fourth Amendment in each case challenged." *Id.* In both *Oliver v. United States*, 466 U.S. 170 (1984), and *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court warned against such an ad hoc analysis, explaining that a case-by-case approach would not provide law enforcement with a workable framework and thus a categorical approach was necessary. *Oliver*, 466 U.S. at 181; *Riley*, 573 U.S. at 398.

573 U.S. at 385). Additionally, and maybe even more importantly, "a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up." *Id.* This means that "[v]irtually any activity on the phone generates CSLI, including incoming calls, texts, or e-mails and countless other data connections that a phone automatically makes when checking for news, weather, or social media updates." *Id.* As a result, "[a]part from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data." *Id.* A cell phone user does not "voluntarily 'assume[ ] the risk' of turning over a comprehensive dossier of his [of her] physical movements" simply by using a cell phone. *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 745 (1979)). We therefore conclude that the third-party doctrine is likewise not applicable to our analysis concerning real-time CSLI.

Because we perceive no meaningful distinction between the privacy issues related to historical and real-time CSLI, we agree with defendant that the principles expounded in *Carpenter* should be applied in the present case. We therefore are of the opinion that a cell phone user enjoys an expectation of privacy in real-time CSLI that society recognizes as reasonable. *See Patino*, 93 A.3d at 51. For the foregoing reasons, we hold that the acquisition of real-time CSLI qualifies as a search under the Fourth Amendment for which a warrant supported by probable cause is required.

**B**

**Real-Time CSLI Under Article 1, Section 6**

Although we decide this issue based on Fourth Amendment principles, we pause briefly to discuss article 1, section 6 of the Rhode Island Constitution which also affirms an individual's right to be free from unreasonable searches. "[T]his state * * * has a long tradition of careful adherence to Fourth Amendment jurisprudence as developed by the United States Supreme Court." *State v. Reisner*, 253 A.3d 1273, 1286 (R.I. 2021) (Goldberg, J., concurring in part and dissenting in part). However, it is well established that article 1, section 6 of the Rhode Island Constitution may afford greater protection than the Fourth Amendment in certain circumstances. *See State v. Werner*, 615 A.2d 1010, 1012 (R.I. 1992) ("We [have] noted that although Supreme Court holdings control[] questions of federal constitutional law and establish[] the minimum level of constitutional protection against unreasonable search and seizure, a state constitution may be interpreted to afford greater protection to citizens of that state."); *see also State v. von Bulow*, 475 A.2d 995, 1019 (R.I. 1984) ("[W]e have previously recognized our right to 'establish a higher standard of protection [for a criminal defendant] than [that which he] [or she] might otherwise be afforded under the [F]ourth [A]mendment.'") (quoting *State v. Ahmadjian*, 438 A.2d 1070, 1082 (R.I. 1981)).

In *Pimental v. Department of Transportation*, 561 A.2d 1348 (R.I. 1989), we held that the Rhode Island Constitution provides greater protection than the United States Constitution. *Pimental*, 561 A.2d at 1350-53. In *Pimental*, we concluded that article 1, section 6 prohibits drunk-driving roadblocks because if police were permitted to stop citizens at sobriety checkpoints on public roads, "the tide of law enforcement interest could overwhelm the right to privacy." *Id.* at 1352. We deem *Pimental* analogous to the case at bar—each case concerns expectations of privacy as one moves throughout the community and travels along public roadways and thus the reasoning of *Pimental* is applicable to real-time CSLI; although an individual's real-time CSLI may reveal them to be traveling on a public road, permitting law enforcement to obtain this information from an individual's cell phone without a warrant "would diminish the guarantees against unreasonable searches and seizures in the Rhode Island Constitution." *Id.* Therefore, even if the acquisition of defendant's real-time CSLI were not a search under the Fourth Amendment, it would constitute a search under the state constitution. Article 1, section 6 of the Rhode Island Constitution is an alternative, independent foundation upon which our holding could rest. We are mindful, however, that "[t]he decision to depart from minimum standards [imposed by the Fourth Amendment] * * * should be made guardedly and should be supported by a principled rationale." *Werner*, 615 A.2d at 1014 (quoting *State v. Benoit*, 417 A.2d 895, 899 (R.I. 1980)).

Furthermore, in *State v. Andujar*, 899 A.2d 1209 (R.I. 2006), we emphasized "how reluctant this Court is to depart from the federal interpretation of the Fourth Amendment to the United States Constitution when called upon to construe the protections of article 1, section 6, of the Rhode Island Constitution." *Andujar*, 899 A.2d at 1224 n.12. This Court explained how we previously "abandoned the Fourth Amendment's treatment of warrantless automobile searches, opting instead to make exigency essential before a warrantless automobile search could be commenced under article 1, section 6" but then "proceeded to realign article 1, section 6, with the Fourth Amendment, [because] the United States Supreme Court had since 'dissipated the gray cloud of uncertainty that once encompassed the issue of exigency.'" *Id.* (quoting *Werner*, 615 A.2d at 1014). Thus, "absent any widespread uncertainty concerning the appropriate scope of Fourth Amendment protections * * * we accord the federal interpretation [deference] when construing article 1, section 6." *Id.*

## C

### Exigent Circumstances

The defendant contends that the trial justice erred in determining that the exigent circumstances exception applied to the facts of this case. Specifically,

defendant argues that the detectives were not engaged in hot pursuit.[12] We disagree.

"The lynchpin of any Fourth Amendment analysis is reasonableness." *Taveras*, 39 A.3d at 648. "A search or seizure must be reasonable in its scope and manner of execution." *State v. Querido*, 229 A.3d 410, 417 (R.I. 2020). "Although most police searches must be undertaken pursuant to a lawfully issued warrant, a warrant is not a requirement for all lawful searches." *State v. Grant*, 840 A.2d 541, 550 (R.I. 2004). "As the Supreme Court has recognized, '[t]he relevant test is not the reasonableness of the opportunity to procure a warrant, but the reasonableness of the seizure under all the circumstances.'" *Id.* (emphasis omitted) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976)). "From [the Fourth] [A]mendment derives one of the most fundamental principles of constitutional jurisprudence—that entries and 'searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are *per se* unreasonable * * * subject only to a few specifically established and well-delineated exceptions.'" *Terzian*, 162 A.3d at 1239 (quoting *Duquette v. Godbout*, 471 A.2d 1359, 1362 (R.I. 1984)). "[B]ecause the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions." *Id.* (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).

---

[12] The defendant also contends that there was no danger of imminent harm or a specific risk that evidence would be destroyed. Because we conclude that the detectives were engaged in hot pursuit, we need not address these arguments.

"One such recognized exception is that of exigent circumstances * * *." *State v. Portes*, 840 A.2d 1131, 1136 (R.I. 2004); *see also State v. Jennings*, 461 A.2d 361, 366 (R.I. 1983) ("In certain cases, 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'") (quoting *Mincey*, 437 U.S. at 394). "The exigent-circumstances exception to the warrant requirement applies when 'there is compelling need for official action and no time to secure a warrant.'" *State v. Gonzalez*, 136 A.3d 1131, 1164 (R.I. 2016) (Goldberg, J., concurring) (quoting *McNeely*, 569 U.S. at 149). "In demonstrating a compelling and urgent necessity sufficient to circumvent the constitutional mandate of a warrant, the police 'bear a heavy burden[.]'" *Terzian*, 162 A.3d at 1241 (quoting *Gonzalez*, 136 A.3d at 1151). We do not depart from this requirement, but recognize that exigent circumstances "may support a warrantless search * * *." *Carpenter*, 138 S. Ct. at 2222.

Examples of exigent circumstances include "law enforcement's need to provide emergency assistance to an occupant of a home," or to "engage in hot pursuit of a fleeing suspect," or "enter a burning building to put out a fire and investigate its cause," or "prevent the imminent destruction of evidence." *Gonzalez*, 136 A.3d at 1164 (Goldberg, J., concurring) (quoting *McNeely*, 569 U.S. at 149). "[T]he typical situation in which the exigent-circumstances exception applies occurs when police officers are pursuing an offender [who] they have probable cause to believe

- 29 -

committed a known offense." *Duquette*, 471 A.2d at 1362. "Whether circumstances rise to the level of exigency is determined by referring to the facts known to the police at the time of the arrest. * * * '[T]he police [must] have an objective, reasonable belief that a crisis can only be avoided by swift and immediate action.'" *State v. Gonsalves*, 553 A.2d 1073, 1075 (R.I. 1989) (quoting *Duquette*, 471 A.2d at 1363).

In the present case, the trial justice credited the testimony of the detectives who testified during the suppression hearing, and based upon their testimony, concluded that the detectives had an objective, reasonable belief that exigent circumstances existed that justified the acquisition of defendant's real-time CSLI without a warrant. *See Gonsalves*, 553 A.2d at 1075. We agree with the trial justice's finding and are satisfied that in the context of this case, the detectives were in hot pursuit of defendant. Simply put, suspecting defendant was involved in Fiore's violent murder, the detectives sought to question him. Upon encountering the detectives outside the probation office, defendant denied he was Sinapi and fled. This deception and flight justifiably raised the level of interest to that of a suspect, who the officers knew had been released from prison only days earlier. *See State v. Peltier*, 116 A.3d 150, 155 (R.I. 2015) ("It is universally conceded today that the fact of an accused's *flight* * * *, resistance to arrest, concealment, *assumption of a false name*, and related conduct, are admissible as evidence of consciousness of

guilt, and thus of guilt itself.") (emphasis added) (quoting *State v. Palmer*, 962 A.2d 758, 769 (R.I. 2009)).  It was at this point the detectives' hot pursuit commenced. They exited the probation office and searched the local area for defendant. Unsuccessful in their search, they returned to the probation office and obtained defendant's cell phone number and address on file.  Importantly, it was only after defendant provided them with a false name and fled that the detectives "pinged" defendant's phone.  Thus, at the time of the warrantless search of defendant's real-time CSLI, the detectives were pursuing a fleeing suspect, potentially involved in a brutal murder.

The defendant contends that because the detectives had "not chased him from the scene of the crime" they were not in hot pursuit.  We emphasize, however, that "hot pursuit means some sort of a chase, but it need not be an extended hue and cry in and about the public streets." *United States v. Santana*, 427 U.S. 38, 43 (1976) (internal quotation marks and brackets omitted).  The defendant also compares the present case to *Gonzalez*, arguing that if the exigency exception did not justify the warrantless entry into a defendant's home even when eyewitnesses *directly connected* the defendant to a recent homicide, then the exigency should not apply here.  The defendant misconceives *Gonzalez*, however, which concerned a warrantless arrest of a defendant in his home and not hot pursuit. *See Gonzalez*, 136 A.3d at 1147.  In *Gonzalez*, police officers testified that they believed there were

exigent circumstances based upon the possibility of destruction of evidence, the possibility that the defendant might have been in possession of a firearm and could hurt someone else, and the severity of the crime to which the defendant was a suspect. *Id.* at 1152. Although this Court recognized the "critical nature of those factors," there simply was no exigency after nearly seven hours elapsed from the time the defendant was identified as the perpetrator to the time of the warrantless arrest in the home. *Id.* at 1152-53, 1154. In the case before us, the detectives were in hot pursuit of defendant. The defendant's reliance on *Gonzalez* is therefore unavailing.

Adding to the level of exigency to locate Sinapi was the credible information that he previously had threatened Fiore's life. Although we recognize that "[i]t is inconsistent with the Fourth Amendment to adopt the position that 'the seriousness of the offense under investigation *itself* creates exigent circumstances of the kind that under the Fourth Amendment justify a warrantless search,'" *Jennings*, 461 A.2d at 367, "the gravity of the underlying offense" is "an important factor to be considered when determining whether any exigency exists * * *," *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). The detectives also knew that defendant had just been released from prison, having been incarcerated for another crime. Furthermore, the detectives believed that defendant could be in possession of the

firearms that were missing from Fiore's apartment based upon credible information that defendant had been accused of stealing Fiore's guns in the past.

In light of the facts known to the police at the time—defendant's falsification of his name, his flight from police, his status as a suspect in a murder investigation, and the suspicion that he was in possession of two guns missing from the crime scene—and their hot pursuit of defendant, we conclude that the police had an objective, reasonable belief that exigent circumstances existed, *see Gonsalves*, 553 A.2d at 1075, "compelling [the] need for official action [without] time to secure a warrant," *Gonzalez*, 136 A.3d at 1164 (Goldberg, J., concurring). The hot pursuit arose as a result of the officers' face-to-face encounter with defendant. We emphasize that the officers did not simply arrive at the probation office, request defendant's cell phone number, and immediately ping it. Rather, after receiving information that defendant was at the probation office, the officers sought only to talk with defendant, who they knew had just been released from incarceration days earlier. The officers also were aware of an allegation that defendant had previously threatened the victim and stolen a gun from him, and, furthermore, they knew that the victim's vehicle, guns, and answering machine were missing from the crime scene. Upon arriving at the probation office, the officers, unbeknownst to them, encountered defendant. During this encounter, defendant lied and said he was not

Sinapi, gave a false name, and fled the area. These facts were sufficient for the officers to give chase to defendant.

Although we recognize that the trial justice clearly erred in determining how much time it would have taken the detectives to obtain a warrant for defendant's real-time CSLI, acquiring a warrant would have nonetheless caused delay. Under the facts as presented here, we conclude that there was a "compelling necessity for immediate action [that would] not brook the delay of obtaining a warrant." *Terzian*, 162 A.3d at 1241 (quoting *Gonzalez*, 136 A.3d at 1151).

We pause to note the reasonableness of the conduct of the police officers after they concluded that defendant was at the home of his ex-girlfriend. They obtained consent to enter and search the premises, verified that the cell phone on the table was that of defendant, and located the black gloves, the black trash bag and its contents, and the black dice hat. They obtained a search warrant to seize these items in the home.

## D

## Harmless Error

The state argues that assuming, *arguendo*, that the trial justice erred in denying defendant's motion to suppress, that error is harmless. According to the state, the majority of the evidence defendant sought to suppress in connection with the warrantless search of his real-time CSLI was not related to the larceny conviction.

Rather, the state asserts, there was ample additional evidence to support defendant's larceny conviction that the state collected independent from the warrantless search. We agree.

"Harmless error is recognized to be an error that 'in the setting of a particular case [is] so unimportant and insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.'" *Terzian*, 162 A.3d at 1244 (quoting *State v. Lopez*, 943 A.2d 1035, 1043 (R.I. 2008)). "This Court has acknowledged that 'whether or not an error is harmless turns on whether it is reasonably possible that the error contributed to the conviction.'" *Id.* (quoting *Lopez*, 943 A.2d at 1043). "When evaluating improperly admitted evidence, this Court reviews the remainder of the evidence introduced to discern whether the error was harmless beyond a reasonable doubt." *State v. Ramirez*, 936 A.2d 1254, 1267 (R.I. 2007).

The defendant sought to suppress voluminous material, including (1) his cell phone, (2) an envelope and its contents, (3) the black dice hat, (4) black gloves, (5) a black trash bag and its contents, (6) a white powdery substance, (7) two sets of pills, (8) conversations with the occupants of Josephine's home, (9) his flight from Josephine's home, (10) his act of hiding in front of the Citizens Bank after his flight

- 35 -

from Josephine's home, (11) his statements to the police after he was arrested, and (12) evidence of his bodily injuries when arrested.[13]

Although defendant contends that these items must be suppressed due to the warrantless search of his real-time CSLI, it is worth noting that the third "ping" of defendant's cell phone did not reveal his location to be at Josephine's house. Rather, the "ping" indicated that he traveled through Providence and into Johnston. The police anticipated defendant's destination as 15 South Fairview Street in Johnston based on information that his former girlfriend, Josephine, lived there and based on information that it was defendant's last known address. Because 15 South Fairview Street was defendant's last known address, it was inevitable that the police eventually would search for defendant at that address. *See Barkmeyer*, 949 A.2d at 998 ("When the evidence sought to be suppressed 'would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible.'") (quoting *State v. Firth*, 708 A.2d 526, 529 (R.I. 1998)).[14]

---

[13] We do not address defendant's claim that the trial justice erred in denying his motion to suppress the white powdery substance or his statements to the police after his arrest. *See* footnote 8 of this opinion.

[14] Although the trial justice did not address the issue of inevitable discovery, "[t]his Court may affirm a decision 'on grounds other than those relied on by the trial justice.'" *State v. Barkmeyer*, 949 A.2d 984, 998 n.12 (R.I. 2008) (quoting *Shepard v. Harleysville Worcester Insurance Co.*, 944 A.2d 167, 170 (R.I. 2008)).

Furthermore, when the police arrived at Josephine's house, she consented to a search of her home. *See Barkmeyer*, 949 A.2d at 996 ("The Fourth Amendment prohibition against the warrantless entry into a person's home does not apply 'to situations in which voluntary consent has been obtained, either from the individual whose property is searched * * * or from a third party who possesses common authority over the premises * * *.'") (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). In the course of the search conducted in accordance with Josephine's consent, the police found defendant's cell phone, the black gloves, the black trash bag and its contents, and the black dice hat. Despite having consent for the search of the home, the police applied for a search warrant. In accordance with the warrant, the detectives seized a plastic bag containing prescription pills, an envelope, the black trash bag and its contents, the hat with the dice on it, the black gloves, and the cell phone.

This is a case in which defendant was convicted of felony larceny of an automobile. We conclude that it is not reasonably possible that the majority of the evidence defendant sought to suppress contributed to the larceny conviction. *See Terzian*, 162 A.3d at 1244. Specifically, the contents of defendant's cell phone, the envelope and its contents, the black dice hat, the black gloves, the black trash bag and its contents, the two sets of pills, the conversations with the occupants of the house, and his bodily injuries when arrested were unrelated to the larceny charge.

Thus, it is clear that the state's case against defendant did not rise or fall on this evidence. *See State v. Sanchez*, 206 A.3d 115, 123 (R.I. 2019).

The only evidence that defendant sought to suppress which could have contributed to the larceny conviction was defendant's flight from the house and his attempt to hide from the police, as this is evidence suggestive of guilt. This was not the only evidence of flight admitted at trial, however. The defendant first fled from the police outside the probation office, prior to the warrantless search of his real-time CSLI.

After reviewing the totality of the evidence related to the larceny conviction, we are satisfied that any error was harmless beyond a reasonable doubt. *See Ramirez*, 936 A.2d at 1267. This evidence included surveillance footage showing defendant in the vicinity of Hillside Avenue on December 30, 2014—the day Fiore was found murdered and in the area where Fiore's car was ultimately found. Additionally, defendant's historic CSLI, for which the police properly obtained a warrant, placed defendant's cell phone in the area of Hillside Avenue on December 30, 2014. Inside Fiore's car, on the backseat, was a red sweatshirt that Cataldi identified as Fiore's. Christina informed police that she had seen defendant wearing the red sweatshirt, and defendant's DNA was found on the sweatshirt. Additionally, DNA found on the steering wheel and gearshift of Fiore's car was consistent with defendant's DNA profile. There was also testimony that defendant had offered to trade a Chevy

Impala—the make and model of Fiore's car—for some drugs on December 26, 2014. In the face of this evidence, we conclude that any error in denying defendant's motion to suppress was harmless beyond a reasonable doubt.

## II

### DiSano's Identification

The defendant next contends that the trial justice erred in denying his motion to exclude identification testimony under Rule 403 by United Parcel Service (UPS) driver David DiSano.[15] The defendant argues that DiSano's testimony was unreliable and misled the jury.

Mr. DiSano was assigned to a delivery route in Johnston in December of 2014. At trial, DiSano testified that he made a delivery to 17 Hillside Avenue around 11:30 a.m. on December 30, 2014. According to DiSano, while he was parked on Hillside Avenue with the sliding doors of his UPS truck open, he noticed a car parked behind his truck. He testified that a man exited the car and walked by the front of his UPS truck. Mr. DiSano averred that the man "looked like he was in a little bit of a rush" and that he "got a weird vibe" when he saw the man because "he was walking quite

---

[15] The defendant does not contend that the admission of DiSano's identification of defendant violated his due-process rights. Therefore, we need not analyze the reliability of the identifications from a constitutional standpoint. *See Perry v. New Hampshire*, 565 U.S. 228, 248 (2012) ("[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.").

fast with his head down towards my vehicle, so I got a little nervous or defensive." According to DiSano, the man was white, bald, shorter than six feet tall, maybe in his fifties, "a little heavy-set," "stocky," and "rough looking." However, he observed the man's face only from the eyebrows up because the man was looking down at the ground. The man walked towards Manton Avenue. Mr. DiSano explained that he was watching the television later that evening, when he saw a photo of defendant on the news. He recognized defendant as the man who had walked in front of his UPS truck while he was making his delivery at 17 Hillside Avenue on December 30, 2014. Mr. DiSano acknowledged that, after seeing defendant's picture on the news, he conducted some research on defendant.

On January 2, 2015, DiSano went to the Cranston police station and was interviewed by Det. Pezzullo. Mr. DiSano was then shown a photo array that was compiled by Det. Pezzullo and included six photos. Detective Anthony Massimino served as the independent administrator[16] of the photo array. When DiSano was shown the third photo, he stated "[t]his one might have been him * * *." Mr. DiSano stated that the face looked familiar, including "[t]he eyes maybe, like the forehead area, the eyebrows * * *." The photo chosen by DiSano was that of defendant.

---

[16] According to Providence Police Department policy, an independent administrator of a photo array is "[a]n officer who does not know the identity of the suspect who has been placed in a photographic or physical line-up by the case investigator. Also referred to as a 'Blind Administrator'." General Order 360.08 at 2 (Nov. 3, 2021).

Prior to trial, defendant sought to exclude DiSano's identification of him, relying on Rule 403. A hearing on the motion included a voir dire of DiSano and Det. Massimino also testified. The trial justice denied defendant's motion and ruled that both DiSano's out-of-court and in-court identifications of defendant were admissible. During trial, defense counsel renewed his objection to both DiSano's in-court and out-of-court identifications, which the trial justice overruled. Mr. DiSano identified defendant, in court, as the individual he saw on Hillside Avenue on December 30, 2014. His out-of-court identification of defendant from the January 1, 2015 photo array also was admitted into evidence.

## Standard of Review

"When an issue concerning the admission or exclusion of trial evidence is properly preserved for appellate review, this Court employs an abuse of discretion standard of review." *State v. Doyle*, 235 A.3d 482, 493 (R.I. 2020). Thus, "[t]his Court will not reverse a trial justice's ruling admitting evidence over a Rule 403 objection unless it constitutes a clear abuse of discretion." *State v. Brown*, 42 A.3d 1239, 1242 (R.I. 2012).

However, "[t]he raise-or-waive rule is a fundamental precept that is staunchly adhered to by this Court." *State v. Parrillo*, 228 A.3d 613, 623 (R.I. 2020). "It is well settled that a litigant cannot raise an objection or advance a new theory on

appeal if it was not raised before the trial court." *State v. Dennis*, 29 A.3d 445, 449 (R.I. 2011) (quoting *State v. Bido*, 941 A.2d 822, 828-29 (R.I. 2008)).

**Analysis**

On appeal, defendant argues that there was a high chance that DiSano's testimony would mislead or confuse the jury, that vastly outweighed its probative value, and should have been excluded under Rule 403. The defendant argues that new, emerging, empirical evidence suggests that eyewitness identifications are consistently misunderstood by jurors and are likely to mislead them and create unfair prejudice against defendant.

The state responds that defendant waived his argument that unreliable eyewitness identifications are likely to mislead jurors and create unfair prejudice against defendant because it was not raised before the trial justice, nor did defendant present the trial justice with the opinions upon which he now relies. The state also contends that defendant's claim that the trial justice erred in denying his motion to exclude DiSano's identifications of him is without merit. Specifically, the state asserts there was no error because the reliability of an identification is a question properly left for the factfinder. The state posits that the trial justice properly concluded that, the probative value of DiSano's identifications was "extremely high" because DiSano identified defendant near the location where Fiore's car was located, allowing the jury to draw an inference with regard to the larceny charge.

- 42 -

After a careful review of the voluminous record in this case, we conclude that defendant's argument that the trial justice erred in allowing DiSano's identification testimony based on new, emerging empirical evidence of unreliability was not preserved for appellate review and therefore not properly before this Court. This Court consistently declines to overturn a conviction based on an issue that was not considered by the trial justice.

The defendant argued to the trial justice that DiSano's testimony was "not valid" and was "patently unreliable" because DiSano testified that he was unable to see the man's face when he walked past his UPS truck, and, further, that he saw defendant's picture on the news, before he identified defendant's photo in a photo array at the police station. Notably absent from defendant's argument in the Superior Court is any suggestion that eyewitness identifications are consistently misunderstood by jurors. The sources defendant now relies on to argue that "a considerable amount of empirical evidence" indicates that eyewitness identifications are fallible were not presented to the trial justice. *See State v. Hampton-Boyd*, 253 A.3d 418, 426 (R.I. 2021) (declining to inject information regarding the reliability of cross-racial eyewitness identifications into the review of the case where this Court determined it did not have before it any findings by the trial justice regarding the relevancy of binders of scientific studies because defendant failed to raise the issue of cross-racial eyewitness identification in a meaningful way at trial and because the

state did not have an opportunity to supply countervailing data on the issue). Accordingly, we are of the opinion that defendant's argument was not properly preserved for appeal.

To the extent defendant asserts, as he did below, that DiSano's identifications should have been excluded under Rule 403 because their probative value was substantially outweighed by the danger of unfair prejudice to defendant or misleading the jury, we reject this contention. The defendant contends that the probative value of DiSano's identifications was substantially outweighed by the danger of unfair prejudice or misleading or confusing the jury because, according to defendant, the circumstances surrounding DiSano's identification of him presents a "textbook example of suggestive circumstances." We disagree.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have declared, however, that "a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly. * * * It is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it." *State v. Pona*, 66 A.3d 454, 466 (R.I. 2013) (quoting *State v. Smith*, 39 A.3d 669, 675 (R.I. 2012)).

In the case at bar, we are not persuaded that the trial justice's decision to admit identification evidence was an abuse of discretion. The trial justice found that the probative value of this evidence was "extremely high," noting that DiSano allegedly saw defendant on the street where Fiore's car was found, and, thus, could lead the jury to certain inferences. Here, law enforcement officials did not arrange the suggestive circumstances surrounding DiSano's identifications. In *Perry v. New Hampshire*, 565 U.S. 228 (2012), the United States Supreme Court held that "[w]hen no improper law enforcement activity is involved, * * * it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Perry*, 565 U.S. at 233.

A review of the record reveals that defense counsel was permitted to extensively cross-examine DiSano about his identifications of defendant, revealing to the jury that DiSano did not see the entirety of the face of the man who walked by his UPS truck and that DiSano had seen defendant on the news afterwards. We therefore conclude that it was within the purview of the jury whether to find DiSano's testimony reliable, what weight to accord that evidence, and what inferences to draw from DiSano's identifications of defendant.

We are equally satisfied that any error in admitting DiSano's identifications of defendant was harmless. "When evaluating improperly admitted evidence, this Court reviews the remainder of the evidence introduced to discern whether the error was harmless beyond a reasonable doubt." *Ramirez*, 936 A.2d at 1267. Abundant additional evidence was introduced at trial to support defendant's larceny conviction. This evidence included surveillance footage of defendant in the vicinity of Hillside Avenue on December 30, 2014, historic CSLI placing defendant's phone in the area of Hillside Avenue on December 30, 2014, testimony that defendant had been seen wearing Fiore's telltale red sweatshirt that was found in the abandoned vehicle, defendant's DNA on the red sweatshirt, defendant's DNA on the steering wheel and gearshift inside Fiore's car, and testimony that defendant had offered a Chevy Impala to two drug dealers in exchange for some drugs on December 26, 2014. In light of this evidence, we are satisfied that any error in admitting DiSano's identifications of defendant was harmless beyond a reasonable doubt.

### III

### Cataldi's Testimony

We next address defendant's claim that the trial justice erred in denying his motion to exclude Cataldi's testimony that her brother never allowed anyone to drive

his car.[17]  The defendant argues that Cataldi visited her brother too infrequently during the last year of his life to know whether or not he had a habit of refusing to allow anyone to drive his car.  The defendant further argues that evidence that Fiore never lent his car to anyone was not the type of ingrained practice sufficient to constitute a habit under Rule 406.

The defendant moved pretrial to preclude Cataldi from testifying that Fiore did not let anyone drive his vehicle.  A voir dire examination of Cataldi was held, during which Cataldi testified that she usually visited Fiore at his apartment about once a week but in the last couple of years before his death, she visited him "maybe once a month" due to their parents being ill.  She testified that every time she visited Fiore, his car was parked in the same spot.  She also testified that since she and her brother began driving, Fiore was a "car nut" and loved cars, always keeping his car in pristine condition.  She stated that he never allowed anyone to drive any of his vehicles.

The defendant moved to exclude Cataldi's testimony pursuant to Rules 406 and 602 of the Rules of Evidence.  Counsel argued that Cataldi's testimony did not qualify as evidence of habit under Rule 406 because Fiore's tendency not to allow anyone to use his car was not a "semiautomatic," or "habitual act[]."  Counsel also

---

[17] Although the trial justice referenced Rule 405 of the Rhode Island Rules of Evidence in denying defendant's motion, both parties agree on appeal that the trial justice admitted the evidence pursuant to Rule 406.

argued that Cataldi did not have sufficient personal knowledge about whether Fiore allowed anyone to use his car during December of 2014 in order to satisfy Rule 602. The trial justice denied defendant's motion, reasoning that Cataldi had personal knowledge that Fiore never let anyone drive his car going back to the time when Cataldi and Fiore were of driving age and that Cataldi's testimony was sufficient to establish the existence of a habit.

## Standard of Review

"It is well settled that '[t]he admissibility of evidence is a question addressed to the sound discretion of the trial justice and will not be disturbed on appeal absent a clear abuse of that discretion.'" *Dawkins v. Siwicki*, 22 A.3d 1142, 1154-55 (R.I. 2011) (quoting *Barkmeyer*, 949 A.2d at 1005). "We give considerable latitude to a trial justice's rulings made during examination of witnesses at trial." *Id.* at 1155 (quoting *Barkmeyer*, 949 A.2d at 1005). "Therefore, the decision is reversible only if we are satisfied 'that the trial justice abused his or her discretion and thereby prejudiced the defendant such that a new trial is required.'" *Id.* (quoting *Barkmeyer*, 949 A.2d at 1005).

## Analysis

The defendant argues on appeal that the trial justice erred by denying his motion to preclude Cataldi from testifying that Fiore never let anyone drive his car. According to defendant, Cataldi had not spent enough time with Fiore during the last

year of his life to have an adequate basis to testify that he never lent his car to his friends. The defendant also asserts that because Fiore had developed an opiate addiction before his death, his tendency not to lend his car to anyone may have changed without Cataldi's knowledge.

At the outset, the state asserts that defendant did not properly preserve this issue for appeal because his objection was not sufficiently specific. As to the merits of defendant's claim, the state contends that Cataldi's testimony was properly admitted as habit evidence. The state notes that Cataldi testified that Fiore consistently refused to let her drive his car and never allowed any of his siblings to drive his car either. Furthermore, the state points out that Cataldi testified that she regularly visited Fiore's home.

We begin by holding that defendant's claim was properly preserved. In this case, defendant's objection was sufficiently focused, within the context of which it was made, as to direct the trial justice's attention to the basis of his objection. *See* R.I. R. Evid. 103(a)(1); *see also State v. Barros*, 148 A.3d 168, 172 (R.I. 2016) ("The Rules of Evidence require that a specific ground for an objection must be stated unless the reason for the objection is clear from the context in which it was made."). After a hearing on defendant's motion *in limine*, the trial justice denied the motion, but noted defendant's objection. Trial commenced that same day and Cataldi testified. Although defendant objected to her testimony without stating a ground for

the objection, it is clear that the trial justice and counsel for the state understood the grounds for the objection in light of Cataldi's earlier testimony. "While setting forth the specific grounds for an objection is preferred, we rule that in the context of *this* case, defendant properly preserved this issue for appeal." *State v. Baptista*, 894 A.2d 911, 914 n.2 (R.I. 2006).

We next turn to the merits of defendant's claim. Rule 406 provides, in its entirety:

> "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

"We note that Rule 406 provides no guidance about the precise definition of 'habit' * * *." *Dawkins*, 22 A.3d at 1155. This Court, however, has noted that "the Advisory Committee Notes to Rule 406 of the Federal Rules of Evidence (the text of which rule is identical to Rule 406 of the Rhode Island Rules of Evidence), * * * define[s] [habit] as being one's regular response to a repeated specific situation." *Id.* "Although there are no precise standards for determining whether a behavior pattern has matured into a habit, two factors are considered controlling as a rule: adequacy of sampling and uniformity of response." *Gonpo v. Sonam's Stonewalls & Art, LLC*, 41 F.4th 1, 12 (1st Cir. 2022) (quoting *United States v. Newman*, 982 F.2d 665, 668 (1st Cir. 1992)). "These factors focus on whether the behavior at issue 'occurred

- 50 -

with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances.'" *Newman*, 982 F.2d at 668 (quoting *Weil v. Seltzer*, 873 F.2d 1453, 1460 (D.C. Cir. 1989)). "The requisite regularity is tested by the 'ratio of reaction to situations.'" *Id.* (quoting *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 512 (4th Cir. 1977)). "There is no bright-line rule about the number of times the witness must have engaged in a particular practice before evidence of habit and routine may be admitted." *Dawkins*, 22 A.3d at 1155. *Compare State v. Taylor*, 626 A.2d 201, 202 (R.I. 1993) (holding that testimony regarding routine procedures followed before clients are allowed to take methadone out of clinic for home use was admissible habit evidence), *with State v. Cotty*, 899 A.2d 482, 494 (R.I. 2006) (holding that evidence that an individual became combative or aggressive while intoxicated on five out of thirty-seven occasions was insufficient to establish a habit).

In *Dawkins*, this Court concluded that the trial justice did not abuse his discretion in admitting a doctor's testimony concerning his practice of treating patients with similar symptoms pursuant to Rule 406. *Dawkins*, 22 A.3d at 1155-56. The plaintiff in the case argued that to establish the proper foundation for habit evidence, defendant was required to testify about how many times he had treated patients with similar symptoms to the plaintiff prior to treating her. *Id.* at 1146, 1155. This Court rejected the plaintiff's argument, explaining that the "defendant properly

- 51 -

laid the foundation that in the course of his tenure in emergency medicine he developed certain routines in treating thousands of patients over his twenty-year career." *Id.* This Court opined that "[t]here was adequate testimony that during the approximately ten years he was an emergency room physician, defendant had treated thousands of patients, and therefore was able to describe his routines at the time he treated plaintiff." *Id.* at 1156 n.12.

As in *Dawkins*, we conclude that the trial justice did not abuse his discretion in admitting Cataldi's testimony that Fiore consistently refused to lend his car to other people and that whenever she visited Fiore at his apartment, his car was always parked in the same parking space. Although Cataldi testified that her brother had developed an opiate addiction from an injury and conceded on cross-examination that she had told detectives she had not visited Fiore at his apartment since April of 2014, this witness was Fiore's sister and knew him his entire life. Ms. Cataldi testified that Fiore was a "car person," always taking very good care of his car. Ms. Cataldi averred that Fiore never let her drive his car, never let their siblings drive his car, and was not in the habit of lending his car to other people. This testimony supports an inference that Fiore's tendency never to let anyone use his car "occurred with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances." *Newman*, 982 F.2d at 668. It was for the jury to accord whatever weight to this evidence it deemed appropriate. The

defendant engaged in extensive cross-examination of the witness in an effort to call into question the reliability of Cataldi's testimony. *See Dawkins*, 22 A.3d at 1156 (holding that argument regarding habit evidence went to its weight, not admissibility). We therefore reject the contention that the state failed to lay the proper foundation to admit Cataldi's testimony pursuant to Rule 406 and are satisfied that it was not an abuse of discretion for the trial justice to admit evidence of Fiore's habit.

The state contends that even if the trial justice erred in allowing this evidence to be admitted at trial, the error was harmless. We agree, considering the overwhelming evidence of defendant's larceny of the vehicle.

## IV

## Violation of Probation

Lastly, defendant claims that the trial justice erred in determining that he had violated the terms and conditions of his probation. Specifically, defendant asserts that he had been adjudicated a probation violator based on the same conduct the state presented at trial in support of its contention that he had violated his probation a second time. The defendant also argues that he was declared a violator without adequate notice. The state, on the other hand, argues that defendant fails to address on appeal the trial justice's determination that the doctrine of equitable estoppel

precluded defendant from raising these arguments. According to the state, this failure constitutes waiver. We agree.

On January 2, 2015, seven days after defendant's release from prison, the state filed the first violation notice, alleging that defendant "failed to keep the peace and be of good behavior," that was not contingent upon any specific criminal offense, but, rather, based upon conduct summarized in police reports attached to the violation notice. A hearing on the first violation notice was held on March 23, 2015, during which defendant admitted to violating the terms of his probation. The defendant was sentenced to a term of three years to serve. After the indictment was returned, the state filed a second violation notice on July 8, 2015. This notice alleged that defendant failed to comply with a condition of his probation by failing to "keep the peace and be of good behavior." The factual circumstances that support the violation were set forth in the indictment (P1/15-2223A) that was attached to the notice. There was no objection or challenge to the notice of violation. The hearing was postponed by agreement.

A combined jury trial on the indictment and a violation hearing commenced on October 18, 2019. Importantly, both parties agreed that the two matters would be tried simultaneously. Months after the jury returned its verdict, defendant filed two separate motions challenging the violation hearing. First, defendant filed a motion to declare the violation hearing moot. The trial justice denied the motion

after a hearing, relying on the doctrine of judicial estoppel. The defendant filed a second motion, seeking to preclude the trial justice from declaring him a violator based on conduct not noticed in the violation report. Another hearing was held during which the trial justice denied the motion and deemed defendant a violator of the terms and conditions of his probation based upon the second violation notice. The trial justice concluded that defendant had violated his probation based on three separate incidents: (1) drug transactions between defendant, Ralph Quinones, and Luz Ramirez; (2) defendant's presence at Fiore's apartment either during or shortly after his murder and defendant's flight from the scene of the crime in conjunction with his failure to notify the police of the crime; and (3) defendant's larceny of Fiore's car.

In making these three independent determinations, the trial justice relied on: the testimony of Quinones and Ramirez that defendant had engaged in drug transactions with them—testimony the trial justice found to be credible; testimony that defendant offered to trade the car to Ramirez in exchange for drugs; the presence of defendant's DNA at the scene of the crime and in Fiore's car; evidence of his flight from the crime scene; DiSano's identification of defendant; surveillance footage placing defendant in the vicinity of Hillside Avenue where Fiore's car was found; and Cataldi's testimony that her brother never let anyone drive his car. The

trial justice ordered defendant to serve nine years of the previously imposed sentence.

## Standard of Review

"A probation violation hearing has a singular focus: determining whether the conditions of probation—namely, '[k]eeping the peace and remaining on good behavior—have been violated.'" *State v. Gibson*, 126 A.3d 427, 431 (R.I. 2015) (quoting *State v. Hazard*, 68 A.3d 479, 499 (R.I. 2013)). "To establish a probation violation, the state must demonstrate 'by a fair preponderance of the evidence that the defendant breached a condition of the defendant's probation[.]'" *State v. Regan*, 273 A.3d 116, 118-19 (R.I. 2022) (quoting Super. R. Crim. P. 32(f)). "This Court reviews a hearing justice's decision in a probation-revocation proceeding to determine 'whether the hearing justice acted arbitrarily or capriciously in finding a violation.'" *State v. Texter*, 896 A.2d 40, 43 (R.I. 2006) (quoting *State v. Sylvia*, 871 A.2d 954, 957 (R.I. 2005)).

## Analysis

Before this Court, defendant first contends that the trial justice erred by violating him twice based upon the same conduct—larceny and his presence at, and subsequent flight from, Fiore's murder. The crux of defendant's argument is fundamental fairness. According to defendant, he was unjustly punished twice for the same failure to be of good behavior. The defendant, however, fails to address

the trial justice's reliance on the doctrine of judicial estoppel. Specifically, defendant provides no explanation as to why we should assign error to the trial justice's determination that defendant was estopped from making such an argument.

In *New Hampshire v. Maine*, 532 U.S. 742 (2001), the United States Supreme Court explained the parameters of the doctrine of judicial estoppel:

> "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. * * * This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase. * * * [O]ther courts have uniformly recognized that its purpose is to protect the integrity of the judicial process * * * by prohibiting parties from deliberately changing positions according to the exigencies of the moment * * *. Because the rule is intended to prevent improper use of judicial machinery * * * judicial estoppel is an equitable doctrine invoked by a court at its discretion * * *." *New Hampshire*, 532 U.S. at 749-51 (internal quotation marks and citations omitted).

"This Court previously has [also] recognized the principle of judicial estoppel." *Gaumond v. Trinity Repertory Company*, 909 A.2d 512, 519 (R.I. 2006). The doctrine of judicial estoppel is "driven by the important motive of promoting truthfulness and fair dealing in court proceedings." *D & H Therapy Associates v. Murray*, 821 A.2d 691, 693 (R.I. 2003). "Judicial estoppel differs from such other forms of estoppel as promissory estoppel and equitable estoppel in that 'judicial

estoppel focuses on the relationship between the litigant and the judicial system as a whole,' rather than solely on the 'relationship between the parties.'" *Gaumond*, 909 A.2d at 519 (quoting *D & H Therapy Associates*, 821 A.2d at 693). "Of utmost importance in determining whether to apply the doctrine of judicial estoppel is whether the 'party seeking to assert an inconsistent position would derive an unfair advantage * * * if not estopped.'" *Id.* (quoting *New Hampshire*, 532 U.S. at 751). "Ordinarily, the application of estoppel is an extraordinary form of relief, that will not be applied unless the equities clearly [are] balanced in favor of the part[y] seeking relief." *Shorrock v. Scott*, 944 A.2d 861, 864 (R.I. 2008) (quoting *Gaumond*, 909 A.2d at 519). However, "[b]ecause the rule is intended to prevent improper use of judicial machinery, * * * judicial estoppel is an equitable doctrine invoked by a court at its discretion." *Gaumond*, 909 A.2d at 519 (quoting *New Hampshire*, 532 U.S. at 750). "[T]his Court will not disturb a trial justice's invocation of judicial estoppel absent an abuse of discretion." *Iadevaia v. Town of Scituate Zoning Board of Review*, 80 A.3d 864, 870 (R.I. 2013).

At the conclusion of the hearing on defendant's motion to declare the violation proceeding moot, the trial justice denied the motion, relying on the doctrine of judicial estoppel. He explained:

> "It was by agreement the second 32(f) notice was going to proceed during the time of trial simultaneously, if you will, however, the matter be decided post-trial.

"The [c]ourt notes that at this point in time, I understand defense counsel said they didn't object to certain evidence coming in. From the simultaneous nature of the trial and the violation hearing, there were no objections. The [c]ourt's understanding was that the violations on these new offenses were going to proceed. Nobody has briefed the [c]ourt on estoppel, however, the trial justice has the discretion to invoke [the] [d]octrine of [j]udicial [e]stoppel. That situation is limited to a scenario where the [j]udge finds a party's inconsistent positions would create an unfair advantage. * * *

"In this particular case, I know hindsight is 20/20. The [s]tate could have made a record with regard to the violations and what the admission encompassed back on March 23, 2015, likewise, defense could have done that, as well, and it did not have to be any kind of admission. That's a discretionary act.

"The [c]ourt's going to deny the motion that's before it."

At a subsequent hearing, defendant objected to this decision but conceded that he failed to object to the violation hearing proceeding simultaneously, noting that it was an "oversight" and "was not done intentionally." The defendant argued that he did not gain any unfair advantage from raising his objection posttrial. The trial justice rejected defendant's arguments and reiterated his determination that the doctrine of judicial estoppel applied.

On appeal, defendant does not contend that the trial justice's invocation of the doctrine of judicial estoppel was an abuse of discretion. We therefore conclude that

defendant has waived this issue.[18] *See Stebbins v. Wells*, 818 A.2d 711, 720 (R.I.

2003) ("The failure of a party to challenge a trial court's ruling or to brief a particular

issue on appeal results in a waiver of that issue."); *see also Cavanaugh v. Palange*,

111 R.I. 680, 684, 306 A.2d 182, 185 (1973) ("[I]t is totally inappropriate for this

[C]ourt to rule on [an] issue where the plaintiff has deprived the [C]ourt of the benefit

of strong research of the full legal and policy issues presented in an adversary

context. Therefore, that issue is deemed to have been waived * * *.").[19]

Moreover, even if defendant had properly challenged the trial justice's

decision, we are hard-pressed to envision how the trial justice's reliance on the

---

[18] In his reply brief, after the state argued that defendant had waived the issue of judicial estoppel, defendant argued that he did not waive the issue because a portion of his principal brief was "dedicated to an explanation of just why equity demanded a result different than the one reached by the trial justice." In his principal brief, defendant contended that his "argument [was] centered on fairness" but did not discuss the doctrine of judicial estoppel. Because defendant failed to provide any "developed argument or explanation concerning an assignment of error," *Bispo v. Cracker Barrel Old Country Store, Inc.*, 252 A.3d 736, 738 (R.I. 2021), as it specifically relates to the trial justice's application of the doctrine of judicial estoppel, we conclude that defendant has waived the issue.

[19] The defendant also argues that the trial justice erred by declaring him a violator based upon his participation in drug transactions which were not referenced in the second Rule 32(f) notice. As previously noted, however, the trial justice concluded that defendant had violated his probation based not only on the drug transactions but also on his larceny of Fiore's car and his presence and flight from the scene of the murder. Because we conclude that defendant has waived any argument with regard to the first two bases of the trial justice's determination that defendant violated his probation—larceny of Fiore's car and his presence at, and subsequent flight from, Fiore's murder—we need not address this appellate contention.

doctrine of judicial estoppel could constitute an abuse of discretion where defendant agreed to simultaneous proceedings and then, after the evidence was presented on both cases and the jury has returned its verdict, argued that the probation case was moot. Such action by defendant "would derive an unfair advantage * * * if not estopped." *Gaumond*, 909 A.2d at 519 (quoting *New Hampshire*, 532 U.S. at 751). The fact that there was an overlap of proof at trial is the very nature of simultaneous proceedings.

To the extent the defendant asserts that his argument raises a question of subject-matter jurisdiction, we note that this Court has previously cast doubt on the application of the double jeopardy clause in probation violation proceedings which are civil in nature. *See State v. Dale*, 812 A.2d 795, 798 (R.I. 2002) ("[W]hen applying a double jeopardy argument to the context of a Super. R. Crim. P. 32(f) probation violation, it should be noted that the proceedings are civil in nature, not prosecutorial.") (footnote omitted).

## Conclusion

For the reasons set forth in this opinion, we affirm the judgments of the Superior Court. The papers in this case may be returned to the Superior Court.

Justice Lynch Prata did not participate.

- 61 -

**Robinson, J., concurring in part and dissenting in part**. With one significant exception, I am pleased to concur in the opinion of the Court concerning the several issues that were preserved for appellate review. Where I emphatically part company from the majority is with respect to what I consider to be the entirely unnecessary and unwise foray into the difficult issue as to whether, in the absence of a recognized exception to the warrant requirement, the Fourth Amendment's protections apply to warrantless access by the police to an individual's real-time cell-site location information (CSLI). I dissent from every jot and tittle of the Court's extensive discussion of that challenging constitutional issue. I decline to indicate whether I agree or disagree with that discussion because I do not believe that addressing that issue is necessary or advisable when one takes into account the facts of this particular case.[1] It is my considered judgment that, in light of the fact that the Court has determined that in the instant case exigent circumstances existed which permitted warrantless access to defendant's real-time CSLI, further analysis of what might be the scope of constitutional protection in the absence of exigent circumstances is unnecessary and unwise.[2] The venerable and well-settled doctrine

---

[1] It is my belief that the constitutionality *vel non* of police access to real-time CSLI should be addressed in a case where the facts require us to squarely confront the constitutional question. This is not such a case.

[2] I hasten to add that I am in agreement with the majority's analysis of the exigent circumstances issue.

of constitutional avoidance strongly counsels against wading into challenging and unsettled constitutional waters when there is absolutely no necessity to do so. *See, e.g.*, *In re Brown*, 903 A.2d 147, 151 (R.I. 2006) ("Neither this Court nor the Superior Court should decide constitutional issues unless it is absolutely necessary to do so."); *see also Andrews v. Lombardi*, 233 A.3d 1027, 1034 (R.I. 2020) ("It is a steadfast principle of our jurisprudence not to pass on questions of constitutionality unless adjudication of the constitutional issue is necessary.") (internal quotation marks omitted); *State v. Beaudoin*, 137 A.3d 717, 726 (R.I. 2016) ("When * * * this Court faces a fork in the road, with one turn that will require it to slog through the thicket of a constitutional issue and the other offering a journey through more hospitable terrain, we routinely elect to take the path of least resistance."); *State v. Berberian*, 80 R.I. 444, 445, 98 A.2d 270, 270-71 (1953); *Irons v. Rhode Island Ethics Commission*, 973 A.2d 1124, 1135 (R.I. 2009) (citing "our long-standing policy of not reaching constitutional issues that prove unnecessary for the disposition of the case at bar"); *State v. Lead Industries Association, Inc.*, 898 A.2d 1234, 1239 (R.I. 2006) (citing "our reluctance to adjudicate constitutional questions when a case is capable of decision upon other, non-constitutional grounds"); *Caron v. Town of North Smithfield*, 885 A.2d 1163, 1165 (R.I. 2005) (mem.) ("[T]his Court has on many occasions held that it will not decide a case on constitutional grounds if it otherwise can be decided."); *see generally Harmon v. Brucker*, 355 U.S. 579, 581

(1958) (per curiam) (stating that there is a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case "); *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) (Frankfurter, J.) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality * * * unless such adjudication is unavoidable."); *United States v. Gonzalez*, 736 F.3d 40, 40 (1st Cir. 2013) ("Discretion is often the better part of valor, and courts should not rush to decide unsettled legal issues that can easily be avoided."); *United States v. Gertner*, 65 F.3d 963, 973 (1st Cir. 1995) (Selya, J.) ("[C]ourts must resist the temptation to pluck issues from the stalk before their time. The judicial task, properly understood, should concentrate on those questions that must be decided in order to resolve a specific case. This is especially true when unsettled issues of broad public concern are afoot.").

I would also observe, as does the majority, that the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), dealt *only* with historical CSLI and *not* with real-time CSLI. *Carpenter*, 138 S. Ct. at 2220. In fact, the Supreme Court was explicit about that point, stating: "Our decision today is a narrow one.

We do not express a view on matters not before us: real-time CSLI or 'tower dumps' * * *." *Id.*[3]

It is also noteworthy that two of the Justices in the *Carpenter* majority (*viz.*, Justices Breyer and Ginsburg) and one of the dissenting Justices in that 2018 case (*viz.*, Justice Kennedy) are no longer on the Court. I do not believe that anyone can predict with total confidence what conclusion the present Supreme Court may reach with respect to the real-time CSLI issue which the Court in *Carpenter* very explicitly chose not to address.

In conclusion, I concur in the opinion of the Court except for what it has opted to say regarding the constitutional questions potentially implicated by the issue of warrantless police access to a person's real-time CSLI. I emphatically dissent from the fact that the majority has chosen to wrestle with that issue, and I express absolutely no view whatsoever as to the majority's substantive discussion concerning said issue.

For the above-stated reasons, I submit this partial concurrence and partial dissent.

---

[3]  It is also noteworthy that, as is reflected in footnote 9 of the majority opinion, there is a split of authority among the federal and state courts as to whether accessing a person's real-time CSLI is a search for Fourth Amendment purposes.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Louis Sinapi. |
| **Case Number** | No. 2019-388-C.A. (P1/15-2223A) <br><br> No. 2019-415-C.A. (P1/07-2888A) |
| **Date Opinion Filed** | June 20, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice William E. Carnes, Jr. |
| **Attorney(s) on Appeal** | For State: <br><br> Christopher R. Bush <br> Department of Attorney General <br> For Defendant: <br><br> Angela M. Yingling <br> Rhode Island Public Defender |

SU-CMS-02A (revised November 2022)